# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HTA-SCW WEBB MEDICAL A LLC,** *et al.* | : | **CIVIL ACTION** |
| *Plaintiffs* | : | **NO. 18-1100** |
| | : | |
| **v.** | : | |
| | : | |
| **ROSKAMP MANAGEMENT COMPANY,** *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                 APRIL 14, 2020

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiffs, seventeen limited liability companies (collectively, "Plaintiffs" or "HTA")[1] filed

this civil action against ten defendants, including the Roskamp Management Company,[2] alleging

violations of various state law claims and the Racketeer Influence and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1961 *et seq*., in connection with a series of transactions (the "predicate

acts") that occurred between January 2010 and June 2016.  Plaintiffs assert that some combination

---

[1]     Plaintiffs are the following:  HTA-SCW Webb Medical A, LLC; HTA-SCW Webb Medical B, LLC; HTA-SCW Webb Medical C, LLC; HTA-SCW Granite Valley MOB, LLC; HTA-SCW Mountain View, LLC; HTA-SCW West Medical Arts, LLC; HTA-SCW Colonnade, LLC; HTA-SCW Lakes Medical Plaza I, LLC; HTA-SC Lakes Club, LLC; HTA-SC 13041 DWB, LLC; HTA-SC Cardiac Care, LLC; HTA-SC Eye Institute, LLC; HTA-SC Boswell Medical, LLC; HTA-SC Boswell West, LLC; HTA-SC Royal Oaks, LLC; HTA-SC Lakeview Medical Arts, LLC; and HTA-SC Lakeview Plaza Centre, LLC.

[2]     The ten Defendants are the following:  Roskamp Management Company ("RMC"); Robert G. Roskamp ("Roskamp"); Philip D. Kaltenbacher ("Kaltenbacher"); PDK Family Trust UAD 10-24-2006 ("PDK Trust"); Paul H. Woodruff ("Woodruff"); Woodruff CCRC Partnership, L.P. ("Woodruff LP"); Daniel Sevick ("Sevick"); Whiteland Holdings LP ("WH"); Frazer Exton Development LP ("FED"); and Whiteland Village Limited ("WV") (collectively, "Defendants").

of these Defendants (the "RICO Defendants")[3] submitted false financial disclosures and subsequently engaged in various fraudulent transfers of assets in order to prevent Plaintiffs from collecting on a judgment Plaintiffs obtained against RMC on September 13, 2016.

Before this Court are the motions for summary judgment filed by Defendants pursuant to Federal Rule of Civil Procedure ("Rule") 56, [ECF 48-53]. Plaintiffs have opposed these motions. [ECF 58, 60]. The issues raised by the parties have been fully briefed and are ripe for disposition. For the reasons set forth herein, the RICO Defendants' motions are granted with respect to Plaintiffs' RICO claims (Claim Nine, the only federal claims asserted) and judgment is entered in favor of the RICO Defendants on those claims. Pursuant to 28 U.S.C § 1367(c)(3), this Court declines to exercise supplemental jurisdiction over the remaining state law claims asserted against all Defendants.

**BACKGROUND**

In their complaint, Plaintiffs assert twelve claims against Defendants, all premised upon the Defendants' various participation in an alleged scheme to prevent Plaintiffs from the ability to collect on a judgment Plaintiffs obtained on September 13, 2016, from an Arizona state court against RMC for its breach of contractual obligations under a guaranty regarding leased property in Arizona. Following the completion of discovery, Defendants filed the instant motions for summary judgment in which they argue, *inter alia*, that Plaintiffs have failed to proffer sufficient evidence to meet their summary judgment burdens on their RICO claims, the only claims supporting this Court's original jurisdiction.

---

[3]    The RICO Defendants include the following eight Defendants:   RMC; Roskamp; Kaltenbacher; Woodruff; Sevick; WH; FED; and WV.

When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-movant; here, Plaintiffs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). The facts relevant to the underlying motions are summarized as follows: [4]

### *Facts Underlying HTA's Arizona Judgment Against RMC*

On October 22, 2009, and then again on December 12, 2009, RMC transmitted financial information to Plaintiffs in anticipation of entering into a sale, lease-back, and guaranty transaction that involved seventeen medical office buildings in Phoenix, Arizona. These were the only financial disclosures that RMC provided HTA *before* the parties executed the contracts governing the anticipated sale/lease-back /guaranty transaction.

On December 31, 2009, HTA-Sun City LLC purchased the seventeen medical office buildings from four limited liability companies: KRW MOB-A, LLC, KRW MOB-B, LLC, KRW MOB-C, LLC, and KRW MOB-D, LLC (collectively, the "KRW Entities"). As part of this transaction, title to the seventeen buildings was transferred to Plaintiffs/HTA.[5] Pursuant to the parties' agreement, the KRW Entities leased back some of the medical office buildings pursuant to a separate lease agreement (the "Master Lease") and RMC entered into a guaranty agreement (the "Master Lease Guaranty"), thereby guaranteeing the KRW Entities' financial obligations under the Master Lease for four years.

The Master Lease Guaranty provided that the "Guarantor [RMC] shall maintain at all times during the entire period this Guaranty remains in effect (i) Liquid Assets (as defined below) in an amount equal to not less than One Million and No/Hundred Dollars ($1,000,000.00) and (ii) a Net Worth (as defined below) in an amount equal to not less than Twenty Million and No/Hundred Dollars ($20,000,000.00)." The term "Net Worth" was defined as "all assets (excluding intangible assets, and assets either restricted, pledged or encumbered by a security interest or lien) less liabilities as indicated in Management's Internally Prepared GAAP Basis Financial Statements (which do not address FIN46R Consolidation Requirements)." The Master Lease Guaranty required RMC to provide HTA with "quarterly financial statements confirming the foregoing Net Worth requirements"

---

[4]   These facts are taken from the parties' briefs, exhibits, and statements of facts. To the extent that any facts are disputed, such disputes will be noted and, if material, will be construed in Plaintiffs' favor pursuant to Rule 56.

[5]   In their briefs, the parties have raised a dispute as to whether this transaction involved Plaintiffs/HTA or a separate, non-party HTA entity. For purposes of this Court's decision, this Court has construed these facts in Plaintiffs' favor and considered Plaintiffs to be a party to this initial sale/lease-back transaction.

and to notify HTA "if [RMC's] Net Worth falls below the required amounts." After closing on this transaction, RMC provided HTA various financial disclosures, including balance sheets and profit and loss statements, on January 19, 2010, May 12, 2010, October 22, 2010, and February 15, 2011. Plaintiffs contend that RMC's post-closing financial disclosures contained false and/or misleading information.

On January 18, 2013, following the KRW Entities' breach of the Master Lease, HTA filed suit against RMC in Arizona state court for breach of contract under the Master Lease Guaranty. On September 13, 2016, the Arizona state court entered judgment in favor of HTA and against RMC on HTA's breach of contract claim in the amount of $4,126,173.34. That judgment was affirmed by the Arizona appellate court on October 31, 2017.

<u>*Facts Underlying the Santander and Nordbank Settlements*</u>

In January of 2007, FED and WV entered into a loan agreement with Sovereign Bank (later becoming Santander Bank), in which Sovereign Bank provided FED and WV with a $23 million loan (the "Remediation Loan"). The purpose of this loan was to fund the environmental remediation of two land parcels in Chester County, Pennsylvania (the "FED and WV Parcels") that the parties intended to use to construct a continuing care retirement community ("CCRC"), which became known as the Whiteland Village Project. As collateral for the loan, Sovereign Bank received mortgages on the two parcels of land. The loan was guaranteed by RMC, KRW Pennsylvania, LP, Roskamp, Woodruff, and Kaltenbacher. On June 29, 2007, Sovereign Bank and co-lender, HSH Nordbank, AG ("Nordbank"), also executed a term sheet for construction financing for the Whiteland Village Project in the amount of $181.5 million.

On October 7, 2010, Sovereign Bank commenced mortgage foreclosure proceedings in the Chester County Court of Common Pleas against FED and WV due to their failure to repay the Remediation Loan on the maturity date (the "PA Foreclosure Action"). Sovereign Bank also filed a complaint against all guarantors, including RMC, in the same court (the "PA Guaranty Action").

On May 19, 2011, FED and WV filed voluntary Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Eastern District of Pennsylvania. A reorganization plan was worked out in the bankruptcy court by way of a settlement and forbearance agreement in which Sovereign Bank, FED, WV, and the guarantors (including RMC) agreed that Sovereign Bank would receive certain payments. The agreement also required that the FED parcel of land be sold to an unrelated third party by June 30, 2012 (the "Makemie Transaction"), with certain designated proceeds to be paid to Sovereign Bank totaling $17.3 million, and, assuming such payments, with the amount of the lien of mortgage on the WV parcel, and the guaranty, to be reduced to $4.2 million. The settlement also included a release to Sovereign Bank's benefit and provided that FED, WV, and the guarantors (including RMC) had no defenses to Sovereign Bank's claims.

The Makemie Transaction did not close by June 30, 2012, as required. Consequently, Sovereign Bank resumed its efforts to foreclose on the mortgages and to pursue damages from the guarantors (including RMC). On August 9, 2012, Sovereign Bank filed a motion for summary judgment in the PA Foreclosure Action, seeking judgment in the amount of $33,719,060.28, together with costs, interest, and attorneys' fees in an amount to be determined, and post-judgment interest, and the foreclosure and sale of the two mortgaged properties in Chester County, the FED and WV Parcels. Efforts were made in 2012 to settle with Sovereign Bank, including an offer in September 2012 to acquire the loan and collateral from Sovereign Bank for $4.5. million. Another attempt was made in December 2013, when Sovereign Bank was offered $5.57 million for acquisition of the loan and collateral. No settlement was reached at that time.

In the months leading up to April 2013, Nordbank experienced severe financial problems and, as a result, decided it could not fund the Whiteland Village Project. Nordbank did not inform FED, WV, RMC, or the other guarantors (collectively, the "RMC Parties") about its decision until more than six months later when the RMC Parties were about to schedule a closing. In the interim six months, the RMC Parties, relying on Nordbank's promises and assurances, including those made in the term sheet, spent millions of dollars readying the Whiteland Village Project for closing. By the time Nordbank made the last-minute disclosure that it would not be funding the project, the RMC Parties were unable to obtain replacement financing. Nordbank's delayed communication that it was reneging on its commitment to fund the project effectively killed the Whiteland Village Project and destroyed the investment.

On April 30, 2013, FED, WV, and the guarantors commenced an action in the Philadelphia County Court of Common Pleas against Sovereign Bank and Nordbank (the "Philadelphia Action"), premised on the banks' failure to honor their commitments to fund the Whiteland Village Project, and their fraudulent misrepresentations regarding funding. As part of the Philadelphia Action litigation, the RMC Parties sought damages for the millions of dollars they had expended in reliance on the banks' promises, and for the anticipated profits of more than $200 million had the Whiteland Village Project been successful. The RMC Parties produced an expert report quantifying their damages at over $221 million.

On December 4, 2014, FED, WV, RMC, KRW Pennsylvania LP, Roskamp, Woodruff, and Kaltenbacher entered into a settlement agreement with Santander Bank (the successor to Sovereign Bank) ("Santander") resolving all of the then-outstanding litigation between those parties (the "Santander Settlement"). Under the Santander Settlement, Whiteland Holdings LP paid Santander $5,375,000 and, in exchange, received an assignment of Santander's mortgages on the FED and WV parcels. Santander also assigned all of its interest in the underlying loans, and all collateral that supported the loans, to Whiteland Holdings LP. RMC and the other entities involved received releases from Santander and a dismissal with prejudice of the PA Guaranty Action, including a dismissal with prejudice of significant

attorneys' fees which had been sought by Santander.  The Santander Settlement resolved *all* of the litigation between these parties and Santander which had occurred between 2010 and 2014 in the Pennsylvania state court system in Chester and Philadelphia Counties, in the United States Bankruptcy Court for the Eastern District of Pennsylvania, and the United States District Court for the Eastern District of Pennsylvania.

On April 27, 2016, days before jury selection was scheduled to commence in the Philadelphia Action, which then involved on the RMC parties and Nordbank, the court excluded the RMC Parties' introduction of evidence regarding the alleged lost profits.  The trial began on May 4, 2016, but settled almost immediately.  On June 17, 2016, the parties entered into a settlement agreement (the "Nordbank Settlement") that resolved the litigation over the Whiteland Village Project between RMC, FED, and WV, and Nordbank.  The Nordbank Settlement provided all of the involved parties a benefit by way of releases and a significant monetary payment by Nordbank.[6]   The proceeds of Nordbank's settlement payment were first distributed to the RMC Parties' counsel for attorneys' fees and costs and to the parties who funded the litigation.  The remainder went to Santander through Whiteland Holdings LP, to reduce the interest owed on its loan with Santander.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs summary judgment motion practice.  Fed. R. Civ. P. 56.  Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*.  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  Under Rule 56, the court must view the evidence in the light most favorable to the nonmoving party. *Galena*, 638 F.3d at 196.

Pursuant to Rule 56, the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

---

[6]      The amount of this payment is subject to a confidentiality provision.

(1986).  This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  *Id.* at 322.  After the movant has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P 56(c)(1)(A)-(B).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings.  *Celotex*, 477 U.S. at 324.  Rather, the nonmoving party must "go beyond the pleadings" and, either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.*

**DISCUSSION**

At Claim Nine of the complaint, Plaintiffs assert the only federal claim against eight of the ten Defendants: the RICO claim.  In the RICO claim, Plaintiffs assert that the RICO Defendants associated for a common purpose (namely, to financially deprive Plaintiffs of the opportunity to recover on the Arizona judgment that HTA obtained against RMC *only* on September 13, 2016).  In their collective motions for summary judgment, the RICO Defendants argue, *inter alia*, that Plaintiffs have failed to present evidence sufficient to meet Plaintiffs' summary judgment burden with respect to "a pattern of racketeering activity."  Specifically, Defendants argue that Plaintiffs

have failed to present evidence that could show that the alleged "predicate acts" meet both of the requisite "relatedness" and "continuity" tests under RICO.  After a thorough review of the evidentiary record, this Court agrees.

Section 1962(c) of RICO prohibits "any person . . . associated with any enterprise engaged in . . . interstate or foreign commerce, [from] conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To prevail under § 1962(c), a plaintiff must demonstrate: (1) "the existence of an enterprise affecting interstate commerce," (2) "that the defendant was employed by or associated with the enterprise," (3) "that the defendant participated, either directly or indirectly, in the conduct of the affairs of the enterprise," and (4) that the defendant's participation involved a "pattern of racketeering activity."  *Bailey v. Reed*, 29 F. App'x 874, 875 (3d Cir. 2002).  A "pattern of racketeering activity" is defined as requiring "at least two acts of racketeering activity," *i.e.*, predicate acts, within a ten-year period.  18 U.S.C. § 1961(5).  "[T]o prove a pattern of racketeering activity, a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  These are known as the "relatedness" and "continuity" tests or prongs.  The requisite "pattern" is not established unless ***both*** the relatedness and continuity prongs are satisfied.  *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1412 (3d Cir. 1991).  Additionally, "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a Plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."  *Kolar v. Preferred Real Estate Investments*, 361 F. App'x 354, 363 (3d Cir. 2010).

*The Alleged Predicate Acts*

As noted above, to maintain a viable RICO claim, Plaintiffs must establish at least two predicate acts occurring within a ten-year period.  18 U.S.C. § 1961(5).  To support their RICO claims, Plaintiffs rely on three predicate acts:[7] (1) RMC's electronic transmissions in January 2010, May 2010, October 2010, and February 2011 of its financial disclosures to HTA, which included information that allegedly inflated RMC's net worth and induced HTA to enter into the Master Lease with the KRW Entities and the Master Lease Guaranty with RMC; (2) the use of mail or wires in December 2014 with respect to a settlement agreement between RMC and some of the other Defendants and Santander Bank (the "Santander Settlement") to settle the PA Foreclosure Action and the PA Guaranty Action, thereby, depriving RMC of assets and its ability to collect on debts owed to it by FED and WV, against which HTA might have been able to enforce its judgment against RMC; and (3) the "arranging" of the wire transfer of funds in July 2016, as part of the Nordbank Settlement, from Nordbank to the personal accounts of Roskamp and Kaltenbacher, again, depriving RMC of assets against which HTA might have been able to enforce its judgment.  As noted, to trigger RICO liability, these alleged predicate acts must be related and pose a threat of continued criminal activity.

*Relatedness Test/Prong*

To establish the requisite pattern of predicate acts, Plaintiffs must present evidence to show that said acts meet the "relatedness" test.  *H.J., Inc.*, 492 U.S. at 239.  The relatedness test requires the alleged predicate acts to "have the same or similar purposes, results, participants, victims, or methods of commission, or [be] otherwise [] interrelated by distinguishing characteristics [that]

---

[7]      In their brief, Plaintiffs contend that they pled three "categories of [predicate] acts with examples." (Pltfs. Br. at 60).  Though now characterized as categories, Plaintiffs go on to rely only upon the specific examples identified in their complaint.

are not isolated events." *Tabas v. Tabas*, 47 F.3d 1280, 1292 (3d Cir. 1995) (quoting *H.J. Inc.*, 492 U.S. at 240).  Though Plaintiffs have presented evidence that the three alleged predicate acts involved ***some*** of the same Defendants, Plaintiffs fail to proffer any other evidence that the acts are sufficiently related for RICO purposes.  In particular, as addressed below, the evidence shows that the purposes, results, participants, victims, and methods differed between the three predicate acts and, thus, are determined to be, unrelated.

*1.   Electronic Transmission of False Financial Disclosures*

Plaintiffs have not presented any evidence to support their contention that RMC's first alleged predicate act—the electronic transmission of allegedly false and/or misleading financial disclosures to HTA in 2010 and 2011—was "related" to the subsequent alleged predicate acts (the Santander and NordBank Settlements) that occurred in 2014 and 2016.[8]  To the contrary, RMC's electronic transmission of financial information to HTA in 2010 and 2011 was part of an independent transaction with HTA.  Specifically, that independent transaction involved the sale and lease-back of seventeen medical office buildings, between the KRW Entities and HTA, and Defendant RMC's guaranty of the KRW Entities' financial obligations under their Master Lease with HTA.  There is no evidence that this sale/lease-back/guaranty transaction involved the same

---

[8]   Notably, Plaintiffs contend that the false financial transmissions to HTA somehow "induced [HTA] to enter into the Sun City Transaction . . . ." (Pltfs. Br. at 61).  Although wired, false communications that are intended to induce a plaintiff into a transaction *may* constitute a predicate act, in this case all of the alleged false financial disclosures on which Plaintiffs rely were made ***after*** RMC and HTA entered into the Master Lease Guaranty.  Plaintiffs cannot reasonably argue that they were induced to enter into either the Master Lease or the Master Lease Guaranty by false or inaccurate financial disclosures that were provided ***after*** HTA entered into these contracts.  In addition, absent evidence that RMC expected or intended the KRW Entities to break their lease with HTA when RMC entered into the Master Lease Guaranty, it defies reason that RMC's subsequent alleged false financial disclosures were part of a scheme to prevent HTA from collecting on a judgment obtained *years later* following the KRW Entities' breach of the lease.  Under these circumstances, this Court finds that RMC's alleged transmission of false financial information in 2010 and 2011 does not constitute a predicate act for RICO purposes.

purposes, results, participants, victims, or methods of commission as the later alleged predicate acts (the Santander and Nordbank Settlements).  For example, unlike the later alleged predicate acts, this first predicate act did not involve Santander Bank, Nordbank, FED, WV, or KRW Pennsylvania LP.  This initial predicate act also involved a different purpose.  Indeed, Plaintiffs acknowledge as much by alleging that the purpose of RMC's alleged transmission of the false or misleading financial disclosures was to "induce" HTA to enter into the Master Lease and the Master Lease Guaranty—a purpose different than that underlying the RICO Defendants' later settlements of unrelated contentious litigation with two non-party lenders, and also different than the alleged overall scheme of depriving HTA of the ability to collect on a future, then-nonexistent judgment.  In light of the material differences between the first and subsequent purported predicate acts, Plaintiffs' first alleged predicate act (RMC's transmission of allegedly false and/or misleading financial information in 2010 and 2011) is not sufficiently related to the later alleged predicate acts.[9]

### 2-3.   _Santander and Nordbank Settlements_

As with the first alleged predicate act, Plaintiffs also fail to meet their summary judgment burden as to the relatedness of the second and third alleged predicate acts: the acts underlying the Santander and Nordbank Settlements.  The undisputed record demonstrates that the transactions composing the Settlements were independent transactions involving unrelated litigation between various Defendants and their non-party lenders (Santander and Nordbank), with respect to the

---

[9]     This Court notes that numerous Courts of Appeals have affirmed the dismissal of RICO claims due to the lack of "relatedness" where, like here, the only connection between the alleged predicate acts was some of the participants.  _See Howard v. Am. Online Inc._, 208 F.3d 741, 449 (9th Cir. 2000); _Schlaifer Nance & Co. v. Estate of Warhol,_ 119 F.3d 91, 97 (2d Cir. 1997), _Vild v. Visconsi,_ 956 F.2d 560, 566–68 (6th Cir. 1992) (holding that acts by same defendants against plaintiff are unrelated to acts against third parties); _Hartz v. Friedman,_ 919 F.2d 469, 474 (7th Cir. 1990) (holding that acts against the same victims are insufficient to establish relatedness).

Whiteland Village Project properties.  The record further indicates that the relevant transactions were in no way related to the first alleged predicate act, which is the only alleged predicate act that actually involved Plaintiffs.

As described, the Santander Settlement was a resolution of multi-year and multi-forum litigation between Santander Bank, FED, WV, RMC, Roskamp, Kaltenbacher, Woodruff and KRW Pennsylvania LP, which took place from 2010 to 2014, in the Pennsylvania state court system in Chester and Philadelphia Counties, the United States Bankruptcy Court for the Eastern District of Pennsylvania, and the United States District Court for the Eastern District of Pennsylvania.  Those civil actions arose out of disputes between Santander (formerly, Sovereign Bank) and the above-referenced Defendants, involving two mortgaged properties in Chester County (the Whiteland Village Project properties), in which Santander sought, *inter alia*, $38 million owed on the defaulted mortgages.  After years of the multi-forum litigation, the parties reached a settlement, under which RMC and the other Defendants received a complete release from Santander's claims on the mortgages in exchange for the payment of $5,375,000.00, to Santander by Whiteland Holdings LP.  In addition, Whiteland Holdings LP was assigned Santander's mortgages on the Whiteland Village Project properties.  It is clear on its face that this transaction provided these Defendants, including RMC, significant value by way of the release. As such, the purpose of this transaction, unlike that of the first alleged predicate act (the only alleged predicate act involving Plaintiffs), was to resolve contentious litigation between some of the Defendants, Santander Bank, and other non-party entities (but not HTA), to the benefit of those parties.  In contrast, the purpose of the Santander Settlement was not to mislead HTA as to RMC's financial wherewithal and/or to induce HTA to enter into the Master Lease and/or the Master Lease

Guaranty; rather, it was to resolve multi-year and multi-forum litigation between some of the Defendants and their lender, Santander.

Similarly, and as Plaintiffs actually concede in their complaint, the Nordbank Settlement resolved "*separate* litigation" between RMC, FED, and WV, and Nordbank over a proposed construction project (the Whiteland Village Project).  (Comp. ¶ 55) (emphasis added).   The litigation over the Whiteland Village Project, which did not involve either HTA or any of the transactions underlying the first alleged predicate act, was settled immediately after the trial court excluded evidence relating to the bulk of the damages sought from Nordbank.  The Nordbank Settlement, like the Santander Settlement, provided all of the involved parties a benefit by way of releases and a significant monetary payment by Nordbank; settlement proceeds of Nordbank's that went first to Defendants' counsel for attorneys' fees and costs and to the parties who funded the litigation, with the remainder going to Santander through Whiteland Holdings LP to reduce interest owed on its loan with Santander.  As such, the purpose of the transaction, unlike the first alleged predicate act (the only alleged predicate act involving Plaintiffs), was to resolve contentious litigation between some of the Defendants and Nordbank to the benefit of those particular parties. The purpose was not to mislead HTA as to RMC's financial wherewithal or to induce HTA to enter into the Master Lease and/or Master Lease Guaranty.

In sum, none of the litigation or underlying acts culminating in the Santander and Nordbank Settlements had any connection to HTA, HTA's entry into either the Master Lease or Master Lease Guaranty, or the disputes that arose out of those earlier transactions between HTA and RMC. Indeed, it belies reason and is unsupported by any evidence of record, that the Santander Settlement—relating to the PA Foreclosure Action and PA Guaranty Action that began in 2010 (years before the Arizona state court litigation between HTA and RMC commenced)—or the

Nordbank Settlement—relating to the Philadelphia Action that involved Nordbank's withdrawal of funding for the Whiteland Village Project—took place for the purpose of either misleading HTA as to RMC's financial wherewithal, inducing HTA to enter into the Master Lease or Master Lease Guaranty, or defrauding HTA of some future, then-nonexistent judgment amount in a separate proceeding involving different property. As such, the evidence does not support that the RICO Defendants' legitimate settlements of multi-forum litigation in December 2014 and July 2016 with their lenders were part of a grand scheme, begun five to seven years earlier, to prevent HTA from the ability to collect on a future, then-nonexistent judgment.

Further, this Court finds persuasive the decision of the Honorable Michael Baylson in the matter of *Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, 2017 WL 877311 (E.D. Pa. Mar. 3, 2017). In *Impala*, Judge Baylson found that an alleged settlement of litigation could not constitute a predicate act sufficient for RICO liability:

> Under the RICO statute, communications and settlements conducted in judicial chambers, law offices, [a defendant's] office, or through court filings cannot be predicate acts. Holding that the mere filing and settlement of litigation could be considered predicate acts, absent significant proof of fraudulent misrepresentation, even assuming the jurisdictional requirements of the use of the mail or wire, would have far reaching and ominous consequences. Furthermore, finding the [settling party's attorney's e-mail] to be a predicate act would not only be beyond the scope of the RICO statute but would also be contrary to public policy. Attorneys must have the freedom to ruminate, verbally or in writing or by email, about how to structure a settlement or otherwise conduct litigation. Our justice system encourages settlements, and achieving them should not put a lawyer on the brink of RICO litigation. Nothing in the settlement record of these cases shows that there was any fraudulent act, or use of the mail or wire to accomplish a fraud, such as backdating, fictitious names, dates, or amounts, e.g., that [plaintiff] can point to as constituting a predicate act.

*Id.* at *10. As in *Impala*, Plaintiffs here present no evidence that either of the two **unrelated** settlements involved fraudulent misrepresentations and/or acts to deceive the parties to those

transactions.  The record indicates that the two settlements were legitimate agreements between certain of the Defendants and their lenders.  Indeed, "HTA does not complain about the decision to settle with Santander and Nordbank . . . ." (Pltfs. Br. at 63).  Under the circumstances presented, this Court finds no basis on which these independent settlement transactions could constitute either predicate acts or be sufficiently related to Defendants' transactions with Plaintiffs to trigger RICO liability.

In addition, none of Plaintiffs' cited cases provide support for their contention that a defendant's settlement of litigation—unrelated in any way to plaintiff or plaintiff's transactions with a defendant—can give rise to RICO liability.  To the contrary, all of Plaintiffs' cited cases involved predicate acts/transactions in which the plaintiffs themselves were involved and were deceived or defrauded by the defendant's alleged acts.  Here, neither the Santander nor the Nordbank Settlement involved Plaintiffs in any way.  The settlement transactions involved other parties and the resolution of other unrelated disputes and litigations.  While such transactions involving parties other than HTA could conceivably give rise to state law claims, they are insufficient here to trigger RICO's liability.

### Continuity Test/Prong

This Court will next address the continuity requirements, though such analysis is not required in light of Plaintiffs' failure to meet the relatedness test.  The continuity test requires plaintiffs to show that the predicate acts "amount to or pose a threat of continued criminal activity." *Kehr Packages*, 926 F.2d at 1412.  "Continuity" can be either "closed"—meaning past conduct occurring over a substantial period of time—or "open"—meaning past conduct with the threat of future repetition.  *H.J. Inc.,* 492 U.S. at 241.  A court must look to the facts of each case to determine whether predicate acts constitute a threat of continued criminal activity. *Tabas*, 47 F.3d

at 1295 (citing *H.J. Inc.*, 492 U.S. at 242).  The RICO Defendants contend that Plaintiffs have failed to satisfy the continuity requirement.  This Court agrees.

In their complaint, Plaintiffs appear to allege and rely upon open-ended continuity.  (*See* Compl. ¶ 126 (alleging racketeering activity that is "open," "continuous," and "ongoing.")).  To establish an open-ended scheme, a plaintiff must present sufficient evidence to show "a threat of continued racketeering activity."  *Tabas*, 47 F.3d at 1295; *see also Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 609-10 (3d Cir. 1991).  A plaintiff can make this showing by proffering evidence of "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241.  In addition, "open-ended continuity is established when the commission of the predicate acts is 'a regular way of conducting defendant's ongoing legitimate business.'" *Tabas*, 47 F.3d at 1295 (quoting *H.J. Inc.*, 492 U.S. at 243).  "[P]redicate acts . . . threatening no future criminal conduct do not satisfy [the continuity] requirement:  Congress was concerned in RICO with long-term criminal conduct."  *H.J. Inc.*, 492 U.S. at 242.  Moreover, where a plaintiff alleges a single scheme "directed at a limited number of people," the United Stated Court of Appeals for the Third Circuit ("Third Circuit") "has required some further indication that the defendant's fraudulent activities are likely to continue."  *Kehr Packages*, 926 F.2d at 1413.

The record shows that Plaintiffs failed to establish any facts or evidence to support any ongoing criminal conduct, or future threat of continued racketeering conduct, by the RICO Defendants.  To meet the future continuity requirement, Plaintiffs baldly argue that the RICO Defendants "continue to avoid paying the judgment owed to HTA stemming from the Master Lease Guaranty" by "continu[ing] to move their assets into new shell entities to avoid payment of HTA's judgment."  (Pltfs. Brief at 67).  Plaintiffs, however, offered no evidence that could show any ongoing criminal conduct or any future threat of long-term criminal conduct between or among

the RICO Defendants.  The three predicate acts upon which Plaintiffs base their RICO claims all took place in the past, the latest of which occurred in 2016—more than three years ago.  Plaintiffs presented no evidence of any continued conduct of *any* kind, including any continued efforts to move assets, after July 2016.  This lack of evidence cuts against a finding of current or future threat.  *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) ("no predicate acts have occurred since December 1999, which suggests that the scheme has wound to a close.").  Though Plaintiffs also baldly contend that the predicate acts demonstrate the RICO Defendants' ongoing way of conducting business, there is no evidence in the record that any of the acts relate to the way the RICO Defendants conduct the affairs of their businesses.  Consequently, this Court finds that Plaintiffs cannot satisfy the open continuity test to establish a pattern of racketeering activity.

Plaintiffs also fail to satisfy the closed-scheme continuity test.  "If a plaintiff alleges a RICO violation over a closed period ('closed-ended' scheme), [it] must prove a series of related predicates lasting a 'substantial period of time.'"  *Hughes*, 945 F.2d at 609 (quoting *H.J. Inc.*, 492 U.S. at 242).  Emphasizing that the predicate acts must extend over a substantial period of time, the Supreme Court stated in *H.J. Inc.* that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."  *Id.* 492 U.S. at 242. The Third Circuit has consistently held that conduct lasting under twelve months, with no future criminal threat, does not satisfy the continuity requirement.  *See Hughes*, 945 F.2d at 610–11 (holding twelve month period does not establish closed-ended continuity); *Hindes*, 937 F.2d at 875 (holding eight month period does not satisfy closed-scheme continuity requirement); *Kehr Packages*, 926 F.2d at 1413 (same); *Banks v. Wolk*, 918 F.2d 418, 422–23 (3d Cir. 1990) (same); *Marshall–Silver Constr. Co. v. Mendel*, 894 F.2d 593, 597 (3d Cir. 1990) (holding that seven

month single-victim, single-injury scheme does not satisfy closed-scheme continuity requirement), *overruled on other grounds*, 47 F.3d 1280, 1293 n. 7 (3d Cir. 1995).

Plaintiffs have not met the requirements for closed-ended continuity for the same reasons they fail to meet the relatedness test.  Closed-ended continuity requires "a series of ***related*** predicates . . . ." *Hughes*, 945 F.2d at 609 (emphasis added).  As concluded above, Plaintiffs have failed to show that the alleged predicate acts  were related.  Thus, even though the alleged acts collectively took place over a sufficiently substantial period of time, their lack of relatedness precludes a finding of closed-ended continuity.

In sum, this Court finds that Plaintiffs failed to meet their summary judgment burden with respect to the requisite "pattern of racketeering activity" necessary to sustain their RICO claims.  At best, Plaintiffs have presented evidence showing a collection of isolated transactions involving some of the RICO Defendants that concluded in 2016.  The record is simply insufficient to establish that the alleged predicate acts were related or posed a threat of continued racketeering activity.  Accordingly, Plaintiffs' RICO claims fail, and judgment is entered in favor of the RICO Defendants on these claims.

### *Remaining State Law Claims*

In addition to the RICO claims, Plaintiffs allege numerous state law claims against Defendants.  Supplemental jurisdiction affords federal courts the power to decide state law claims that derive from a common nucleus of operative fact with claims that arise under federal law. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).  However, the court may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c); *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009).  The Third Circuit has directed that district courts "'<u>must</u> decline' to exercise supplemental

jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Stone v. Martin*, 720 F. App'x 132, 135 (3d Cir. 2017) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)) (emphasis in original).

As discussed, this Court is granting the RICO Defendants' motions for summary judgment as to the only claims over which this Court has original jurisdiction. Therefore, in accordance with 28 U.S.C § 1367(c)(3) and the Third Circuit's directive, and because there is no affirmative justification to do otherwise, this Court declines to exercise supplemental jurisdiction over the remaining state law claims.

**CONCLUSION**

The Court finds that there are no genuine issues as to any material facts regarding whether the RICO Defendants participated in a pattern of racketeering activity under the RICO statute and, therefore, the RICO Defendants' motions for summary judgment are granted and they are entitled to judgment, as a matter of law, on those claims. Because summary judgment will be entered on the sole federal claim asserted and this Court declines to exercise supplemental jurisdiction over the remaining state law claims, the remaining state law claims are dismissed without prejudice. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO, J*

19